Case number 23-1525, Afghan and Iraqi allies under serious threat because of their faithful service to the United States on their own and on behalf of others similarly situated versus Antony J. Blinken et al. imbalance. Mr. Platt for the imbalance, Ms. Hirose for the appellee. Good morning, counsel. Mr. Platt, please proceed when you're ready. Thank you. Good morning. May it please the court. Stephen Platt for the United States. The court should reverse the district court under Rule 54. The district court erred in placing excessive reliance on the nine-month timetable in the acts, an over-reliance which infected the rest of its track analysis. There is no need for this court to look at the former injunction or any forthcoming injunctions. The de novo Rule 54 question before this court is simply whether the agencies violated the APA in November 2022. And the agencies then and are now processing SIV applications at a reasonable pace. They faced historic challenges which they've reacted to reasonably and they've also acted reasonably through their own measures of their own initiative and the results are reasonable. General downward trajectories in average processing times, all while the injunction has stayed. The court should hold that there is no APA and reasonable delay, reverse and return this matter to the agency, subject of course to the oversight of the executive and the continuing and substantial reporting obligations for Congress, whether under Rule 54 or 60. Do we, Mr. Platt, have any information about how many pending applications from the original class members still remain pending? That information is is not in the record, Your Honor, and that I think would be difficult to assess given just how dynamic this program is. There are people entering the class every day, leaving the class every day. As far as we are aware, this is the first class action unreasonable delay case this court has seen with individual agency actions for each class member that are being challenged. How about for Iraq? Because there's nobody being added in Iraq, right? That's correct, Your Honor. Congress has not extended the deadline to basically enter in the program. I believe that there are only 79 individuals still in the program, or at least 79 members, excuse me, were in the last congressional quarterly report from the one that was released last week. Now the report wouldn't reflect though, it would reflect everybody, even if during the reporting period, the delay, the case was sort of in their hands, it would still be reported. It would be reported if the agencies took action on their applications and closed out a step. It reports it by step by step. So all of those applications were submitted, the Iraqi applications were submitted no longer, no later than 2014. Yes, Your Honor. And those are, there are still 79 that have not been processed. That's my understanding, Your Honor. And just in the last quarter in which there is a report, the report released last week, the agencies reported that for some of the longest pending applications were closed out such that when you remove those individuals, the average processing times for the Iraq program were, it was simply down to 14 days. So the, I'm sorry, what was that in 14 days? That is the average processing time when the longest pending Iraqi class, they're not class members, but Iraqi SIV applicants are removed from the equation. Can't you always, it seems like you could always reduce the average by taking out the worst case scenarios. No, is that just what you're saying? That is true, Your Honor, but I think that goes to show that the Iraqi program, which has had generally downward trending processing times is in even better shape than just the aggregate 15 months, which is what the agencies reported for the entire Iraqi program as of the report released last week. 14 days from when? I mean, they've already been nine years. I'm not following what that 14 days refers to. Sure. And if I may, thank you. And so what I'm referring to, Your Honors, is on page six, going on to page seven of the report released last week, which is that when you remove cases pending from, this isn't in the JA, Your Honor, this is in the, our supplemental notice, which we had filed last week, reflecting the newest released reports. And on page six, going to page seven, the other 16 cases closed with an average processing time of 14 days. That was what the government was, or the Department of State was able to accomplish in, within this quarter for those applicants. And so overall, the, I'd like to talk a little bit more about the track analysis factor one, which- Let me just back up before you get into that. So as to the class, so only class members are covered. I'm sorry. The plan that's in place only covers the SIV applicants who had applications that had already been pending for nine months as of the summer of 2020. Yes, Your Honor, with just the caveat that the plan has been stayed, but yes, that is the plan that is still, the plan has been stayed since October. Right. But the existing plan is the only injunction in the case. Yes, Your Honor. And as to that injunction, which was premised on the unreasonableness of the delay, the reasonableness of the delay was measured as of the summer of 2020. The unreasonableness of the delay was measured, well, the district court issued its opinion in September, 2019. The proposed injunctive plan, which eventually was adopted by the court, was filed in, I believe, April of 2020. Right. So the determination supporting the plan that is now before us, the unreasonable delay determination was made as of 2020. The unreasonable delay determination that the district court is relying on, the order that's on appeal is from November of 2022. That is on the Rule 54, but I'm just going back and saying the underlying circumstances that support the adjudication plan was a determination as of 2020 that all of the individuals whose SIV applications were subject to the adjudication plan had claims that had been pending for more than nine months, and that that constituted unreasonable delay. And therefore, they were put into the adjudication plan. Is that right? I think we would disagree in that the unreasonable delay determination was as of September, 2019. The unreasonable determination as of September, 2019, and then there's a remedy that's the adjudication plan, which is the injunction, the original injunction. The government appealed that and then decided it wasn't going to appeal the track factor analysis in support of that. Right. But I guess my question is, how did any of the events that the government identifies, which all of which occur after May 2020, how can that reach back and render reasonable delays, which were already unreasonable as of 2019, 2020? They were unreasonable. So I just don't understand how you can now say that the plan should be completely vacated because somehow those delays have been rendered reasonable. So, Your Honor, the government isn't arguing that the court's order in 2019 or in 2020 were, or that the court's unreasonable delay determination in 2019 was flawed or is on appeal. It's not. That appeal is over. That was dismissed. What we have argued before the district court is that there are sufficient change circumstances that the district court should reopen the track analysis and make an unreasonable delay determination as of November 2022. The district court accepted that request. She looked back at track. She reweighed the factors. We disagree with the outcome, but she did agree to look at it. And so the question has become, is there now a lack of an egregious delay of unreasonable delay such that there is an APA violation that can lead to a remedy? So any determination of unreasonable delay with respect to class members who joined the class after May 21st, 2020 is not before us. There's no injunction with respect to that because the adjudication plan doesn't apply to them. That is correct, Your Honor, but the class is defined as individuals who have submitted these and so they are still in the class. And the question that we posed to the district court is whether there is unreasonable delay for the class. She's waiting for a proposal of a modified adjudication plan that presumably would encompass those individuals. But when that's entered, then you can appeal that. But now what's before us is an existing plan that applies only to those class members who, as of May 2020, had already had their weight determined to be unreasonable. So any class member that joined later is not before us, are they? Yes, Your Honor, because the distinction between the APA unreasonable delay, the legal violation on one hand, then the injunction on the other. Unless there is a continuing APA unreasonable delay after the court undergoes its Rule 54 analysis or 60, there can be no injunction. And so that comes from the APA itself, which says that action can be compelled only if there is unreasonable delay. And this court has noted in cases like In Re Bar Labs that even if, after computing the track factors and coming out with an unreasonable delay determination, there is unreasonable delay, that still does not mean that there has to be a remedy. Let's just assume for purposes of argument away the new plaintiffs that have come into the class. Let's just talk about the plaintiffs who were there before as of the first district order and remain there because there are definitely those, right? And as to those, the determination was made in 2019-2020 that the delay was unreasonable as to them. If they're still in the class, then the delay has only gotten longer, right? You don't dispute anything I've said so far. I don't dispute that, Your Honor. Yeah, okay. And so my question is, because the government effectively didn't take an appeal of the initial determination, took the appeal but assessing whether the district court erred in the order that you want us to review now, do we take as a given that it was correct to conclude that the delay was unreasonable as of the time that the district court entered its initial? Two things to that, Your Honor. First of all, no. We believe that the court should not take that as a given that our decision about the appeal is not acquiescence in the legal conclusions that the district court rendered. As far as the facts that she found that at one stage of the appeal, the chief of mission or comm stage, there were 30 to 60 months of delay at minimum just at that one stage. That shows that there have been a general downward trajectory in average processing times to what they are today in last week's report, an average of 12 months for the Afghan program, 15 months for the Iraqi program. But what the court and the parties have been using throughout this case is just the average times. The district court did not ask for any other way to measure delay other than looking at the class as an aggregate. I mean, there's no, for example, subclasses here of individuals who were in the class at a certain time or anything like that. So looking at the class wide without limiting the analysis to simply... What do you say about the people who were in the class before, who were already in the class, not the newcomers, but the people who are already in class and who now are still in the class because they haven't had their application resolved. For them, it's only taken longer. That's just a physical fact about the world. It's only taken longer. But the remedy that you see is that any oversight, any injunction should be eliminated even as to them, right? Because there is no unreasonable delay under the APA. Yes, sir. And even though the delay was deemed to be unreasonable at time one, you didn't appeal that. And now we're at time two, which is longer. The average times are shorter, since... We can talk about what the average times are shorter. I mean, I don't know what the actual fix is to this. If the average doesn't take into account the people whose claims have yet to be resolved, I don't know how much information you get from that because you're just eliminating the people whose applications have been pending the longest and who would raise the average if there were even a projection as to how long it might take as to them. If there's no number in there as to them, the fact that the average has gotten shorter with respect to the people whose claims have already been resolved only tells you so much. It might tell you something, but it only tells you so much because it could be that there's a ton of people whose claims are still out there and who are going to have to wait 40 years. And you would still say, well, that's true, but the average has gotten shorter because if you only look at the people whose claims have been resolved, the time has gotten curtailed. That might be true, but if there's a ton of people out there whose claims are still pending 50, 60, 70 years down the line, the fact that the average has gotten shorter wouldn't give you a whole lot of solace. To that point, Your Honor, I would say two things. First of all, the district court's use of the average times for everyone, we don't believe it's an abuse of discretion, and the class has not argued that it was. The agencies have implemented durable measures that should provide relief for everyone, all applicants, and they should be better positioned to receive a timely adjudication than they ever have been before, given the improved average processing times. And before the district court put forward evidence that, for example, the Afghan Special Immigrant Visa Unit is dedicating 20 percent of its processing time to some of the the agencies are aware of that. They are committed to all applicants, not just the class. But track simply does not lead to a conclusion that there's unreasonable delay such that there can be any continuing injunction in this case. I see that I'm out of time. I'd like to reserve time for rebuttal unless Your Honors have other make sure my colleagues don't. We'll give the we'll give the other side. We'll give you some time for rebuttal. Miss Harris. Good morning. You may please the court. Marika here is safe from the International Refugee Assistance Project for plaintiff appellees, Afghan and Iraqi allies. Defendants began their presentation by confusing the standard of review for this court. The question for this court is whether the district court, with its familiarity of the voluminous record in this case, abused its discretion in refusing to terminate wholesale the injunction that it entered three years ago. In weighing the equities required under any standard for reconsidering a prior decision, the district court properly considered defendants' arguments of changed circumstances with, on the other, the importance that Congress placed on the prompt adjudication of the SIV applications of Afghan and Iraqi allies whose lives are at risk because of their work for the United States. So you're arguing that we should review for abuse of discretion, not de novo, but here the district judge did take up the reconsideration request and at least check into the track factors. So there's an indication that we should look at that. I mean, our precedents say where the merits are, in fact, examined by the district judge, that we should review that as we ordinarily would de novo. Is that wrong? We understand the district courts have considered the defendants' arguments on reconsideration, but then upon reconsideration decided not to, in fact, reconsider the prior summary judgment order or the injunction. I mean, one way of putting it, she reconsidered, but she confirmed her prior view. And I'm thinking about our case, the Connors versus Hallmark case, where the court says when the district court resolves a 54B motion on its merits, rather than by declining to consider the proffered changed circumstances at all, then we do look at that de novo. I think it's somewhat of a thin line between how do you consider the arguments that are brought up in a motion for reconsideration and come to a decision on that. It seems that if the court had reconsidered the merits and granted the defendant's motion, for example, we would have seen a completely different... And if they had what, the defendant's motion? Granted the defendant's motion for reconsideration. Right, but I guess I'm wondering, do you have a, like a thresh, what would a threshold, maybe this is a question for the government, but what would a threshold determination not to revisit the track factors look like under justice so requires? It seems to me that the justice so requires standard gives the district court quite a lot of discretion to go about the analysis in different ways. You argue that she didn't need to even dabble into the track factors the way she did. And I'm just trying to imagine if she hadn't, and if she said, no, I'm not going to revisit this, what would she have considered? She could have considered each of the changed circumstances that defendants raised and said, none of these apply, none of these are tied to the injunctions beneficiaries, which is one of the flaws of their arguments. They are not bringing in statistics that are related to the injunctions beneficiaries. They are not showing how these other changed circumstances actually affect the processing of the injunctions beneficiaries and could have denied the motion on that page. Here, the court decided to also look at those changed circumstances as against the factors on the motion, on the, excuse me, on the track analysis, which I think is also another way to go about this discretionary analysis that the court had before. If the test for whether it's ANOVA or abuse of discretion turns at least in some part on whether the motion is granted or not, which is I think one of the factors you pointed to in response to Judge Pillar, she did grant relief in part, right? She stated that she would consider defendants' arguments and did modify the injunction in part. That's the part that expands the injunction scope. But with respect to the actual termination of the injunction, which is what's on appeal, the defendant's appeal, the court rested on the prior decision to prior summary judgment analysis as well as the injunction that issued. But if the question is, is there enough engagement with the merits based on those decisions that say that it's one thing if the district court decides not to entertain the motion at all, but it's another thing if the district court decides to entertain the motion and then wrestles with it on the law, the latter instance of which would occasion ANOVA review, the former instance of which would occasion abuse of discretion review. Here, the fact that the motion was granted in part would seem to be indicative of an engagement of a kind, if you buy that framework, that would occasion ANOVA review rather than abuse of discretion review. I'm not saying that necessarily means that you can't still prevail. I'm just saying in terms of the way one would frame the inquiry, the fact that the district court granted relief in part would indicate an engagement with the merits of a kind that would potentially put it in the box of cases that would occasion ANOVA. Sure. On that, the question would be where to draw the line. And I think it's a tough question because in order to actually consider a defendant's arguments, the district court may have to undertake different types of analysis on whether to grant or deny the motion for reconsideration. So it's possible. And here, the district court considered each of the factors that defendants based on reconsideration and said, actually, it does not change the analysis overall, the track factors. So we would argue that that's more on denying the reconsideration wholesale as respect to, with respect to the termination of the injunction. Do you agree that no matter what the standard of review we apply, that the district court's determination that the government unreasonably delayed acting on applications that had been pending nine or more months as of May 2020, that unreasonable delay is not before us? The decision from 2019, correct, Your Honor, that is not before us. The question is that refusal to terminate that injunction. Right. So it's the original adjudication plan is what's before us. And the district court's decision in light of the underlying unreasonable delay finding not to terminate the adjudication plan. And then on the current issue before us is whether intervening events have changed or should change that analysis. Absolutely. Yes. That's how I would frame the question. And Judge Pillar, as you were saying before, the purpose of that adjudication plan, the injunction, was and is to adjudicate that fixed universe of SIV applications that were pending as of three years ago, pending for over nine months. And there is no dispute that those cases remain to be adjudicated. Defendants stated that it might be hard, might have been hard for them to put in those numbers, but they chose not to do so. And in fact, the injunction requires them to process those cases and report on the progress. So it really should not be that hard to do. Do you have any sense of how many other than the Iraqi applicants as to whom Mr. Pratt gave us a figure, how many of the applicants, the Afghani applicants from the original that are subject to the adjudication plan remain pending? We don't. The latest report that we have is from July 2021. And for that report, there were still thousands of applicants remaining, even at earlier stages of processing. But because the injunction has been stated since then, we have not been able to get more updated numbers. Those are thousands that not people who came in, not people who applied after the district court's initial ruling. Those are thousands that remained, that whose applications were pending at the time of the district court's initial ruling and remain pending. That's correct. Assume we review a renewed track determination as of the 54B ruling. Let's talk about factors one and two. The statute, it has a shall, which suggests something mandatory. But what follows the shall is a very open-ended goal that would be hard to judicially enforce, improve efficiency. And then it has something that's much more concrete, the nine-month target, but that's preceded by a should, which is generally aspirational. So you have an aspirational goal in a provision that operates in a context where executive discretion would, you know, we would it's preserved as much as possible given the national security and foreign relations overlay. Why is it, why would it be unreasonable, why is it unreasonable if my numbers are right as of 2022, the average delay is something like 587 days. And we have, um, we have DaCosta in a somewhat arguably similar context saying even four and a half years is not automatically too long. Sure, Judge Katsas. I want to answer a couple aspects of your question, one about the nine-month timeline and one about the average processing times that you are pointing to. At first, this court need not decide if the nine-month timeline is mandatory or not, that's not what the district court decided. Rather, the district court looked at the context of that nine-months mark, including the shall earlier in that sentence, as well as the requirements that Congress imposed for reporting to understand that Congress meant something when they said nine months. And that's enough to use it as a rule of reason for purposes of the track. That there has to be a way to give meaning to what Congress said and repeat it again, even during the U.S. withdrawal from Afghanistan. Means something, but means less than it would had Congress said the government shall complete adjudications within nine months. But the court and we are not asking for the adjudications to be completed in nine months. That's sort of water under the bridge. All of these applicants have been waiting already for nine months and as to the 2020 injunction for three more years beyond that. I want to get to your reliance on the average processing times as defendants highlighting of the average processing times for the Iraqi applicants demonstrates. Those numbers are meaningless generally. What their average processing time shows is what they adjudicated, what applications they adjudicated at a certain step in that quarter and how long those applications were pending in that step during that quarter. And they do not process these applications on a first in first out basis. So these average processing times, first of all, are not tied to the applications of the injunctions beneficiaries and they let me let me make sure I understand you're saying that that average time measures, not government controlled steps within the meaning of the statute, some subset of that. No, it is government controlled steps, but it's it's not it emits wait time. It emits wait wait time. So and they are not processing these applications first in first. So if they process an application that came in during that quarter very quickly, that's going to show a very low average processing time. But that's not going to account for the fact that there may be applications of injunctions beneficiaries that are still in the waiting queue and have been. Am I right? I thought your first answer was going to be the average. Maybe this is already clear or maybe I'm wrong that the average processing time is only given for those as to whom the processing is complete. Correct. Yes. So it's like if you have a whole bunch of kids who you're teaching to read and you say, on average, I teach them to read within a month and you're only counting the people who you successfully taught to read, then the average is not including people that you've been trying to teach for a year and a half. That's exactly. So it's it's basically cherry picking and giving you the average of the cherry picked best easiest to result. Yes. OK. So and then within that, you said the average processing times are only looking at step at each step. So because, as Mr. Pratt said, the report is divided out step by step and they're not recumulating to tell us the average total processing times of all the steps of one applicant within the government's control. It's basically a average processing time for a sub part of the overall process. So if I say, oh, the average processing time for Pillard's application was 14 days, it's 14 days at whatever step that that part of the report speaks to. That's right. And that's how they get to 18 days or however many days for the Iraqi applications, because there are no Iraqi applications now at the earlier stages. So they're not adding how long it took at the earlier stages for those applications. So as a current step, it doesn't include people who haven't passed through that step yet. That's right. It's the same problem as with the entire process generally, that it excludes from consideration of the average people who haven't been processed, whether through the entire process, if you're looking at the at the end game or through that particular step, if you're looking only at that step. Yes. Now, that does seem like a question. What's the utility of having an average if it doesn't count the ones that are still pending? But isn't it the case that the starting figure as to how long it was taking that gave rise to the remedy that you saw was also calculated that way? No, those calculations were made by the calculations that plaintiffs submitted based on a more granular data that was provided in discovery. And we were able to produce data that was specific to the class members and to calculate actual waiting time. So what did you do with the people then? Well, at that point, everybody's application was still pending. So how do you get an average processing time for somebody whose application is still pending? It's how long has it been pending as of that date? Yes. I see. And we don't now have that information. We don't have that information. Go ahead. Then is it fair to say that if you're comparing the average time at time one and then the average time at time two, the government's argument is the average time has been reduced, which is a sign of marked improvement. The average time at time one, it sounds like, was figures that you supplied that were based on how long applications have been pending as at that time. We don't have an average processing time for completing it because the applications hadn't been completed. All we had at time one was how long it had taken so far, an average how long it had taken so far. At time two, we're not talking about the ones that are still pending at all. We're only talking about the ones that have been completed. And based on the figures, the government decided to show improvement. And so is it the case that we're not comparing apples to apples? It's not just the fact that the second apple in the apples to apple is flawed under your argument because it doesn't take into account applications that are still pending. It's that you're not comparing the same things from the starting figure and the ending figure. Is that true also? That is true. And defendants did submit their average processing times at the time of the initial summary judgment motion, but the court credited and relied on the numbers. So those of how much into the merits the district court got. We did ask that if the district court were going to go into the merits and actually reconsider that we would be given a fuller record of evidence. The court decided that that was not needed, that it could decide based on the arguments presented that there was need to revisit the determination that is previously in the injunction. But then that's with respect to whether the injunction is going to be eliminated altogether, but with respect to the remaining proceedings before the magistrate judge, there still could be discovery, I take it, about whether the parameters of the original decree ought to be modified to take into account some of the developments that the government has pointed to. Yes, Your Honor, and there has been discovery and that those proceedings are pending. Let me just circle back and pin down. I've struggled a bit with this whole question of the appropriate standard of review. And you argue that we should look at this as if it's a Rule 60B and a motion to terminate injunctive relief. On your theory, does Rule 60B apply to a motion to terminate a preliminary injunction? No, I don't. I don't believe so because 60B speaks to final judgments and orders. This injunction is a permanent injunction. It's final. Except that the context in which it comes up is interlocutory. We don't have a final judgment in the case. And so the reason that there's a restriction for appeal is 1292A and it's coming up because it's a mid-case order, injunctive order, and presumably preliminary injunction would fall in that category. But so does this, no? Well, it is this motion, this appeal, excuse me, is certainly coming up on a refusal to dissolve injunction. Of course, there is a basis for that. The words that are used in each of those sections are slightly different. So it's a final decision for purposes of appeal. 60B speaks of final judgment orders and proceedings, which is quite a lot broader than what Rule 54B speaks about. And Rule 54A actually defines judgment in terms of. So the injunction was appealable, the permanent injunction was appealable at that time, and it was final in the sense that it was entered after a summary judgment order. But it was appealable not under 1291. It was appealable under 1292A1. Well, this court did not decide that question on the prior appeal. Do you think that that could have been appealed under 1291 as a final? Possibly it speaks of final decisions. Again, there's some tension in the words between these different rules and not find a case that was exactly on point for this procedural posture. We would say that whether Rule 54B or Rule 60B apply, they both speak in with Rule 54B being more flexible and Rule 60B being slightly more limited. So there was no legal error or no abuse of discretion in the district court holding that regardless of which standard applied, the outcome would be the same. Judge Kapaskis, I wanted to go back. Sorry, go ahead. All right, go ahead. Go ahead. I was going to ask you, how could it be? 1291. The case is not over and the injunction is not collateral to the merits. It is the merits. So we're in this procedural posture of having a permanent injunction that was issued in mid-case. And so I think the question is, what are the right rules that apply in that circumstance? But it's a permanent injunction. It is a permanent injunction. It's not a preliminary injunction. But it's a permanent injunction as to one claim in an action that has more than one claim. And that just seems like that's classically a Rule 54 heartland where you have one claim that's resolved, other claims that haven't been. And what 54 says is unless the district court does the certification as to that one claim, then the case remains pending. Now, it's still appealable because every injunction is appealable, whether preliminary or permanent under 1292A1. So it just leads to an awkward result to apply Rule 54B because otherwise the victorious party would have to apply for an unnecessary Rule 54B certification in order to achieve finality. And it would also allow defendants to revisit that order on a lower standard, even after the final injunction has gone into effect, that they've started complying with it, all of the reliance interests have started to take place. Except it goes the other way, too. If the defendant is having to comply with it, if it's rendered final, then it seems like having a prompt opportunity under de novo review to appeal whatever the question is, that that's the time to do it. Otherwise, they effectively lose the opportunity for the de novo scrutiny. Sure. And there's no question that they had the opportunity to appeal at the time, but they did and they decided not to pursue it. I think the question is when, even though they had that opportunity, they moved to reconsider that permanent injunction. Should the more stringent standards of Rule 60B apply or the more flexible standards? It's an interesting question. I don't think a panel needs to reach that question here because the district court did not reach it and decided that even under the more flexible standards, there is no need to revisit the prior decision. To go back to DeCosta for a moment, because I know Judge Katz has mentioned that case, there are a couple of differences between this case and the other. And one is really that Congress took a rare step here of specifying a timeline for the adjudication of an immigration application, knowing that it implicates national security interests on both sides, because also following through on our promises to our wartime allies is important. And Congress has repeatedly reiterated that timeline, including through the changed circumstances that defendants claim. And the other difference is that this case is structured and has been structured from the line-jumping concerns that this court has expressed in a number of unreasonable delay cases. What the court issued was a practical and flexible remedy that allows the government to explain any failures to meet performance standards. And it was a remedy that was crafted from the beginning to balance the changed circumstances that might arise as the injunction takes effect. We ask the court to affirm the district court decision for these reasons. And we further respectfully request the court's prompt decision on appeal as the injunction is currently stayed. And injunctions beneficiaries deserve a meaningful remedy as soon as possible. Thank you. Let me just ask you, you said that the remedy was structured to avoid the line-jumping problem because there is no first-in, first-out line in this case. But that also seems like that's been problematic because the government is in effect cherry-picking and processing a lot of the easier cases. And some of the longest-standing, longest-languishing SIV applicants remain languishing. That's just in the nature of the relief. That affects defendants' presentation of the facts. We are fine with defendants prioritizing in the way they want to as long as they are processing these cases to a prompt adjudication as required by the injunction. Thank you, Ms. Jerez. We'll give the government Mr. Patel three minutes for rebuttal. Thank you, Your Honors. The agencies are proud of the improvements they have made in processing times. And the district court called them, quote, a lot of them. I want to emphasize, though, that track is about so much more than just the bottom-line processing times. This court also has to consider as part of the flexible rule of reason why the agencies are taking the time that they are. The district court made findings about, quote, an array of diplomatic, logistical, and other hurdles, quote, pertaining to conducting interviews abroad, especially with the fall of Kabul and the suspension of diplomatic and consular operations by the United States in Afghanistan. Because of the fall of Kabul, the district court found that case inquiries surged 816 percent, and the number of cases grew by 443 percent. This is on page 996 of the JA. As a result, the district court found that the government's task had undoubtedly become more difficult. And that's in addition to other difficulties that the district court recognized, such as— She was very sensitive to your concerns, and she made clear that all of that will count in your favor when you go back and work out the details of a new plan. Why is that an abuse of discretion? Well, we would respectfully disagree that abuse of discretion is the standard here. It would be de novo. And on these facts, the result that the district court should have reached is that there is no APA unreasonable delay. Why is it de novo? Assume I agree with you that she redid the track analysis, and then we just have an appeal from a finding of unreasonable delay. But that finding reflects a balancing of all these fact-intensive considerations that are cutting in opposite directions based on a record developed in the district court. That feels like the kind of thing we would review deferentially. So, Your Honor, and we do maintain that the denial of discretion to reconsider the motion, the court, for example, did not say that justice doesn't require— I agree with you. I'm just saying our review might be discretionary even assuming she redid the track. So, we believe that it's de novo because track cases are reviewed de novo. I mean, that comes from cases like Cobell v. Norton, and under the Trabelsi decision— Cobell said the statement of the legal standard is de novo. Okay, stated the six factors from track. She correctly stated the legal standard, and then we have a mixed question of whether she correctly applied it to this record. I'm not sure the mixed question has to be de novo. So, we believe that, on balance, everything put together points to a finding of—or, excuse me, a conclusion that there is no unreasonable delay. I think most notably with factor two, which this court can and should pick up and review de novo, whether the court correctly interpreted the acts and how the nine-month timetable was used in those acts. I mean, just from the very first page of the memorandum opinion on page 989 of the joint appendix, the court identifies the class as those people being, quote, pending for more than nine months despite Congress's instruction that they should be processed within that time. And then the nine-month figure recurs throughout this decision. But the court, as— She didn't say it was mandatory. She gave it effect, sort of softer effect, as ruler. She said that cuts against you, but as one factor of many, and she balanced that against everything else in the case. So, we believe that that balancing was reversible error. Because if this was truly construed as it is, which is just a precatory deadline in light of the should, the fact that it's coupled with the shall improve efficiencies language, the section saying that a national— You're trying to ask us to review the unreasonable delay determination underpinning the, excuse me, existing adjudication plan, but I thought that's not before us. You abandoned the appeal on that. You had a 60-day time frame in which to appeal that. You didn't appeal that. So, the only thing you're appealing is the effort to modify the plan, the adjudication plan, not the underlying determination of unreasonable delay. So, we are not challenging the injunction under Rule 54B. We are challenging it under Rule 60B, that it's not in the public interest to maintain that injunction, even under a stay or to entertain any forthcoming injunction. But under Rule 54B, the question is, have the circumstances changed such that in November 2022, there is unreasonable delay as measured through track? And the answer to that is no, given that you have a precatory nine-month figure, you have average processing times, which are getting very close to, and at some points, were at about nine months. And then you have everything else, the competing priorities, which the district court did recognize. You have—she didn't find, for example, that those weren't actually things— The average is close to nine months, because that's the average for all the new applicants that come into the class afterwards. But suppose that it's a fact about the world that the existing class members, if things stay as they are—the pre-existing class members, if things stay as they are, wouldn't have their applications resolved for 50 years. Well— Do you think the injunction ought to be dissolved wholesale? I would say, Your Honor, that under track, simply missing a statutory deadline, even if it is a per se point, this court has said in cases like Henry— I agree with that. That may well be right. But I'm just giving you a hypothetical where there's—and we'll just take it as a given that there's thousands on the Afghani side who are continuing to apply, and their applications, if things just stay where they are, are not going to be completed. And there's no oversight. They're not going to be completed for 50 years. Does the fact that the new applicants have their processing time at nine months—and I'll just take as a given that it's actually nine months—that does that mean that the injunction ought to be dissolved? If there are applicants waiting 50 years, Your Honor, I would say I can't answer that question because what we would need to see is the reasons why. All of the other track factors to see an explanation for what challenges are the agencies facing? What are they doing to adjudicate these individuals affected by the agency's operation? But in a case in which we already know that as of the first time, when the applications had already been pending for some number of years, a decision was made that's unreasonable and the government didn't take an appeal. And so then all we're talking about is whether things have changed so significantly that the entire injunction ought to be eviscerated. And what I'm saying is, if the basis for saying that the entire injunction ought to be eviscerated, even though there was no applicants, the time frame is nine months, but with respect to the applicants that were already in the pipeline and have already been there, nothing has changed, and their application is going to remain pending for decades unless the court maintains its oversight, that seems like a lot to accept. That you ought to just look at the new applicants and say, well, the time frame is nine months, and therefore you ought to eliminate the injunctive relief, even as the applicants whose claims had been pending at the time that the initial order was entered and remain pending, and will remain pending for a long, long time, but for district court oversight. Well, what I would say, Your Honor, is that if we're at the point where people are waiting for an average of 50 years, we would want to look at why that is occurring. If there's no good reason, and maybe there is, maybe there will not be at that point, then there would be an APA unreasonable delay conclusion, and then the district court could consider whether to issue remedy. It's under NRABAR LAB, just because there's an APA and reasonable violation does not mean that a remedy must issue. But there is no discrete time point, even when there is a statutory deadline, that there is going to be, per se, an APA violation. What I would also add is that in interpreting the nine-month figure in the acts, in comparing this case to DaCosta, DaCosta also did have a sense of Congress provision that talked about 8 U.S.C. 1571b, which says that it's the sense of Congress that certain immigration applications should be adjudicated within 180 days, and any delay beyond that was not enough for this court to hold it. There was a line-jumping problem there. If the whole process is moving slowly, and there is a commitment in that case by the agency to, in fact, the rule of reason was first in, first out, and so if the court then says, well, you sued, I'm going to put you in the front of the line, that doesn't actually fix the overall problem, does it? It's a very different situation from here, where there's an adjudication plan and the government retains latitude to effectively cherry-pick and put through the people who can be dealt with quickly, even as it delves more deeply into the people whose case is language. It seems like that's a pretty significant difference. That is definitely one part of DaCosta that is not reflected here, that the time, interpreting what Congress has said about timing, I think, is relevant, and the concern about line-jumping, I think, is also why average processing times for everyone was a reasonable thing that the district court did, as opposed to looking at subclasses of individuals who should be able to go first. But again, to be absolutely clear, there is a lot more factors at play here, including competing priorities. All the other factors have tracked beyond just what the bottom line numbers are. Chief Judge Srinivasan, if I may address your point about how you had said in the 50-year hypothetical, and there not being any oversight, Congress is watching this program. Congress has continually amended the acts to change the eligibility requirements, sometimes make it stricter, oftentimes make them more easier for individuals to qualify. They've increased the number of visas available through the program. And Mr. Platt, even though the plan has stayed, the executive is continuing to process these applications, is it not? Oh, absolutely. And so Congress is watching this program and has access to these reports that the agencies, regardless of any injunction, are required by federal law to create and post on their websites, in which they do, in fact, as recently as last week. Mr., any other questions? Thank you. Thank you for your argument, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Katsas